Ryan B. Bell (9956)
Taylor J. Smith (17537)
**MASSEY BEAN & LEWIS**
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-6800
Email: rbell@mbllaw.com
Email: tsmith@mbllaw.com

*Attorneys for Plaintiff Taylor Knuth*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| TAYLOR KNUTH, an individual,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN O'LEARY, an individual, FOX NEWS NETWORK, LLC, a Delaware limited liability company, and DOES I–X;<br><br>Defendants. | **COMPLAINT**<br><br>**(JURY DEMANDED)**<br><br>Civil Case No. 1:26-cv-00203<br><br>Judge:<br><br>Magistrate Judge: |

Plaintiff Taylor Knuth, by and through counsel of record, hereby complains and alleges against Defendants Kevin O'Leary ("O'Leary") and Fox News Network ("Fox," together with O'Leary, "Defendants") as follows:

## INTRODUCTORY STATEMENT

Following a departure from a prior job in April 2026, Taylor Knuth went all-in on developing the next stage of his career. He submitted dozens of job applications. He leveraged his network and attended meetings and lunches almost daily. And he laid the groundwork for starting his own business as a marketing, strategy, network, publicity, and operations consultant

for non-profits, small government, and private businesses, serving clients from a wide geographic range, all while working to finish a PhD program he had started previously. Each of these efforts was premised on the good name Mr. Knuth had built up over years of work and service in public-facing and publicly important pursuits.

All of that changed when Knuth was unceremoniously dragged into the ongoing public debate regarding Kevin O'Leary's development of a massive data center in Box Elder County, Utah. Knuth had expressed opinions about the debate but was not at all a prominent voice on the issue, and was not closely connected with any of the primary figures involved. Despite this, Kevin O'Leary began disparaging Mr. Knuth on social media and on national television (starting with Fox) claiming that Mr. Knuth, among others far more vocal on the data center issue, was an operative for the Chinese Communist Party and was standing in the way of the data center, apparently to assist broader aims of the Chinese state. Of course, this was false. By this point, Mr. Knuth was a private individual, but O'Leary repeatedly disparaged him, finding in Fox a willing collaborator in the campaign of falsehoods.

Mr. Knuth has suffered severe damages. Fox, the largest news organization in the country, put a Canadian celebrity investor, with a net worth of hundreds of millions of dollars, on air five times in three weeks to accuse a private citizen of being a secret foreign agent (which would be a federal crime if it were true) and never once contacted Mr. Knuth, never asked O'Leary for his evidence, and kept permitting him to share these messages nationally even after Mr. Knuth publicly denied it. Since then, Mr. Knuth has seen his career prospects nose-dive, he has had trouble in professional relationships, his name is now plastered across the internet as a

purported Chinese operative, and he has endured severe emotional and physical distress as a result.

By this Complaint, and the allegations set forth, Mr. Knuth asks this Court to hold Defendants accountable for these wrongful acts to the full extent of Utah law.

**PARTIES**

1. Plaintiff Taylor Knuth is an individual domiciled in Ogden, Utah.

2. Defendant Kevin O'Leary, a famous businessman and television personality, is a citizen of Canada, domiciled in Florida. Through a variety of television appearances, including his involvement in the television series "Shark Tank," O'Leary has become a household name known for both his business dealings and media appearances, including his appearance in Fox broadcasting. In addition, O'Leary boasts 2.3 million followers on Instagram, 1.5 million followers on TikTok, 1.2 million followers on X (formerly known as Twitter), 4.6 million followers on LinkedIn, 1.2 million subscribers on YouTube, and 1 million on Facebook—an aggregate following of approximately 12 million.

3. Defendant Fox News Network, LLC, is a Delaware limited liability company with a principal place of business in New York. Upon information and belief, Fox News Network, LLC, operates Fox News Media. According to SEC filings, "FOX News Media is among the most influential and recognized news brands in the world." (*See* https://media.investor.foxcorporation.com/wp-content/uploads/2025/08/11171015/form10k-2025-fox.pdf.) "FOX News Media includes the FOX News and FOX Business networks and their related properties." (*Id.*) That filing reports that Fox News had approximately 61 million subscribers and Fox Business had approximately 60 million subscribers. (*Id.*) The filing also

states that "[f]or over 20 consecutive years, FOX News has been the top-rated national cable news channel in Monday to Friday primetime viewing," that "FOX News also finished the fiscal year [ending June 2025] as the #1 cable network in Monday to Friday primetime and total day viewing among total viewers for the tenth consecutive year," and that "FOX Business is a business news national cable channel and was the #1 business network in business day among total viewers during fiscal 2025." (*Id.*) In addition, "FOX News Media operates a number of digital businesses, including FOX News Digital." (*Id.*) Upon information and belief, Fox News Digital envelops fox.com, foxnews.com, foxbusiness.com, Fox's social media accounts, and Fox's digital subscription services like Fox Nation and routinely publishes and recirculates content produced and broadcast on Fox News and Fox Business, including the shows referenced, *infra*. All in, "Fox News Media reaches nearly 200 million people each month." (*See* https://www.foxcorporation.com/businesses/fox-news/.)

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(l). Specifically, the amount in controversy is more than $75,000.00 and the action is between citizens of different states—Plaintiff Taylor Knuth is a citizen of Utah while, upon information and belief, Defendant Kevin O'Leary is a citizen of Canada domiciled in Florida, and Defendant Fox News Network, LLC, is a citizen of New York and Delaware.

5. This Court has personal jurisdiction over Defendant Kevin O'Leary pursuant to Utah Code § 78B-3-205 and the Constitution of the United States. O'Leary has submitted to jurisdiction in this state by transacting business in Utah. *Id.* § 205(1). O'Leary is the driving force behind efforts to develop a massive data center in Box Elder County, Utah and, in the

process, has purposefully directed transactions, business, interactions, dialogue, rhetoric, and the defamatory comments described herein, into Utah, its elected officials, and its residents. O'Leary has also submitted to jurisdiction in this state by causing tortious injury within this state. *Id.* § 205(3). O'Leary's tortious conduct, described herein, was expressly aimed at, and its effects were felt directly in, Utah. On numerous occasions, O'Leary claimed that Knuth, a private individual, was an agent of the Chinese Communist Party and was improperly impeding the progress of his Utah-based data center project. O'Leary knew that Plaintiff—a subject of his statements—resided in Utah and had deep connections with Utah. O'Leary also knew that the brunt of any reputational harm and other damages would be felt in Utah—and as a direct result of O'Leary's conduct, Plaintiff has, in fact, suffered reputational harm and other injuries in Utah.

6. This Court has personal jurisdiction over Defendant Fox News Network, LLC, pursuant to Utah Code § 78B-3-205 and the Constitution of the United States. Fox has submitted to jurisdiction in this state by transacting business in Utah and contracting to supply services or goods in this state. *Id.* § 205(1)–(2). Fox transacts substantial business in Utah by contracting to and pervasively broadcasting, directing, and distributing its content, including the platforms, television media, social media, and shows described *supra*, in Utah for the express purpose of targeting Utah consumers, who themselves often enter contracts with Fox by subscribing to such Fox media. Fox has also submitted to jurisdiction in this state by causing tortious injury within this state. *Id.* § 205(3). Indeed, as with O'Leary, Fox's tortious conduct was expressly aimed at, and its effects were felt directly in, Utah. Fox published statements that identified Knuth as an agent of the Chinese Communist Party and specifically referenced Knuth by name. Fox knew that Plaintiff—a subject of the statements—resided in and had deep connections with Utah. Fox

also knew that the brunt of any reputational harm and other damages would be felt in Utah—and as a direct result of Fox's conduct, Plaintiff has, in fact, suffered reputational harm and other injuries in Utah.

7. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTUAL ALLEGATIONS

*Knuth's Positive Prior Reputation*

8. Taylor Knuth spent years honing his reputation as a highly qualified progressive organizer assisting advocacy groups to develop sound organizational habits, operate with proper financial controls, and use advocacy to realize real-world results.

9. That excellent reputation propelled him when he campaigned to become the mayor of Ogden City in a highly competitive race in 2023.

10. Knuth advanced to the general election, ultimately finishing as one of the two final candidates in the citywide contest.

11. As a result of that political race, Knuth saw a substantial rise in his profile and entertained several exciting new opportunities.

12. Mr. Knuth was enrolled in a PhD program at the University of Utah and had cultivated a number of critical professional and personal relationships that he expected would serve him no matter the direction he took with his career.

13. Up until April of 2026, he was serving as the Executive Director for Alliance for a Better Utah, a nonprofit organization founded in 2011 and based in Salt Lake City, Utah. The

organization's mission is to drive a public narrative that empowers Utah's electorate and holds public officials accountable, championing good governance, transparency, and civic engagement.

14. Among its most recognized tools is its annual Progress Report, which tracks significant legislative votes and grades every Utah lawmaker, providing constituents with a transparent record of their representatives' conduct. Over many years of advocacy and work in the state, the Alliance has emerged as one of the most trusted organizations by communities across Utah.

15. While working for the Alliance for a Better Utah, Mr. Knuth did what he did best: identify ways to improve the organization, deepen its roots as a force for community change, and assist its growth as an institution that had real impact on improving the lives of Utahns.

16. On April 2, 2026, Knuth parted ways with ABU and began various efforts to explore a next phase of his career and public advocacy efforts.

17. Knuth applied for numerous positions with various organizations across the country.

18. He began to leverage his substantial network by calling, meeting and attending lunches with those he had developed professional relationships with over the years.

19. Knuth even began laying the groundwork to develop his own consulting firm, to assist political action organizations, nonprofits, small businesses, and other community-rooted organizations effectively convey their messages for change.

20. During this time, Knuth was not running for office and was not prominently involved with any particular advocacy group.

21. Notwithstanding the private nature of Knuth's life at the time, his reputation was eviscerated and his efforts at career advancement halted when Kevin O'Leary recklessly dragged him into national attention and proclaimed on Fox that Taylor Knuth was an operative of the Chinese Communist Party.

22. Since those false allegations were broadcast throughout the national media and significantly amplified and proliferated through social media, Knuth's life and prospects have changed in substantial and irreparable ways.

*Kevin O'Leary's Smear Campaign & Fox's Willing Participation*

23. On April 22, 2026, O'Leary Digital, one of O'Leary's companies, publicly presented plans for a 40,000-acre data center project (nearly 5,000 acres larger than Bryce Canyon National Park and nearly three times larger than Manhattan), to be built on the northern tip of the Great Salt Lake, in Box Elder County.[1]

24. On or around April 27, 2026, O'Leary made a series of personal television appearances presenting his view that such data center construction was necessary to compete with China in developing computing power (*See* https://www.foxnews.com/video/6393993618112; https://www.foxbusiness.com/video/6393996759112.)

25. The community pushback to this project was swift and intense.

[1] The long and multifaceted history behind this saga can be briefly reviewed here: https://www.instagram.com/reel/Dc1lwS3NNt8/?utm_source=ig_web_copy_link&igsi=MzRlODBiNWFlZA%3D%3D.

26. Box Elder County commissioners initially postponed decision-making on the project (*See* https://www.ksl.com/article/51489496/amid-questions-and-concerns-box-elder-county-leaders-delay-action-on-data-center-proposal.)

27. Scientists expressed numerous concerns, including with the amount of greenhouse gas production, fuel expenditure, water use, the health of the Great Salt Lake, heat-island effects, a 200% increase in Utah's electricity consumption, (*See e.g.*, https://www.ksl.com/article/news/utah/environment/scientists-share-concerns-over-proposed-mega-data-center-in-box-elder-county/51591514; https://www.ksl.com/article/news/utah/proposed-mega-data-center-draws-concerns-over-heat-island-effect/51591529; https://utahnewsdispatch.com/2026/05/01/box-elder-county-data-center-increase-carbon-emissions/; https://www.sltrib.com/news/2026/04/25/hyperscale-data-center-may-be/.)

28. Members of the community rallied to express their opinions over the project. On one instance, more than 1,000 individuals gathered in protest when the Box Elder County commissioners finally made their decision, and when more than 3,700 individuals lodged formal protests against water rights changes for the project. (*See e.g.*, https://utahnewsdispatch.com/2026/05/04/box-elder-commissioners-approve-data-center/; https://www.kuer.org/business-economy/2026-05-06/utah-project-stratos-box-elder-data-center-water-rights-protest; https://www.sltrib.com/news/environment/2026/05/01/utahns-send-state-deluge-concerns/www.facebook.com/leiainthefield.)

29. Alliance for a Better Utah began publicizing concerns and inviting Utahns to speak out against the project. (*See e.g.*,

https://www.instagram.com/reel/DXrvhbXgLoA/?igsh=MXR1M2dmdDN4bnAzeg%3D%3D (criticizing the project); https://www.instagram.com/p/DX2vRC7mbBX/?img_index=9 (providing action items for opposing Utahns).)

30. During this period of time, Knuth was not associated with Alliance for a Better Utah.

31. Knuth's employment and affiliation had concluded weeks earlier on April 2, 2026.

32. As a private individual, Knuth engaged in his regular pattern of speaking out against projects or policies he did not support. Though he expressed opinions on social media, he did not seek or receive great notoriety for participation in this issue.

33. Knuth did not make any public appearances to discuss the project.

34. Knuth did not start any movements in opposition to the project.

35. Knuth did not assist with any formal efforts to oppose the project.

36. Knuth's participation in the controversy surrounding O'Leary's project was limited to voicing his opinion on the project through a few social media posts and personal communications directed toward individuals already within Knuth's social sphere. None of these social media posts or communications gained any notoriety.

37. In response to the growing opposition to his data center project, Kevin O'Leary initially claimed that protesters were "actually not people who live in Utah" and that they were "being bussed in." (*See e.g.*, https://x.com/kevinolearytv/status/2051667709574733826?s=20; https://www.sltrib.com/news/2026/05/05/kevin-oleary-says-protesters/.)

38. O'Leary then began defending his project by attacking its purported opponents by name.

39. Despite Knuth's limited public participation on the matter, and the fact that he had no affiliation with any group that had publicly spoken out against the project, O'Leary targeted Knuth specifically.

40. Fox joined in these efforts by affirmatively publishing O'Leary's allegations and giving O'Leary various additional media opportunities and platforms from which to declare his false and defamatory claims about Knuth.

**First Instance of Defamation**

41. On May 11, 2026, O'Leary appeared on the Fox show *Mornings With Maria*, wearing a "Utah National Security" hat, and began as follows:

> "We found two cells inside of Utah, Alliance for a Better Utah, **Taylor Kn-uck [phonetic]—Kn-osh [phonetic]** maybe—and [another individual]. Who are you guys and why are spewing all of this misinformation out? You say for a better Utah, why wouldn't you want national defense in Utah, why wouldn't you want compute power … I'm calling out **Taylor** … operating in Utah. I want a forensic audit who is funding their platforms. … So these are proxies for the Chinese government … . **Taylor** … come out, come out, wherever you are, let's audit your books and let's show the people of Utah you actually care about them. … I am calling them out … . And they should thank me for this promotion I am giving them right now. If they have nothing to hide they'll open their books. I don't think so though, I think somebody's paying them.

(*See* https://www.foxbusiness.com/video/6395222677112 (emphasis added).)

42. The Fox host, Maria Bartiromo, clarified, "so what you're suggesting here is that the CCP [Chinese Communist Party] is trying to bust up plans for data center build-outs in the US. . ." These and other of her comments legitimized O'Leary's assertions by claiming that Fox had presented similar stories in which similar operatives had been found. (*Id.*)

43. O'Leary continued, "So … **Taylor** … come out, come out, wherever you are, and let shine the light of transparency on what you are doing, because [you're] also going after the leadership in Utah itself. These … cells, I mean, it's the CCP at work here, there's no question about it." (*Id.* (emphasis added).)

44. Despite his failure to properly pronounce Taylor Knuth's name, the references to Taylor "Kn-uck" and Taylor "Kn-osh" were direct references, and were intended to be direct references, to Taylor Knuth.

45. Throughout the segment, O'Leary identified Knuth by name no less than four times, claimed he was a proxy for the Chinese Communist Party, claimed he was being paid by the Chinese Communist Party to oppose the data center project, and claimed he was a part of a Chinese Communist Party "cell" located within Utah. (*Id.*)

46. Fox not only permitted O'Leary's comments but invited them, legitimized them by claiming they correlated with prior stories, encouraged O'Leary to comment further, and amplified the allegations.

47. Fox was not reporting on defamatory allegations, instead Fox was affirmatively publishing and disseminating the defamatory content itself.

48. Upon information and belief, O'Leary then posted a clip of the interview, including all of his false and defamatory statements about Knuth, on his public social media accounts, including YouTube, X, TikTok, Instagram, and Facebook, garnering over 650,000 views collectively.

49. Upon information and belief those posts included a caption in which O'Leary called Knuth a "prox[y] for the Chinese government" and repeated "This is the CCP at work here. There's no question about it."

**Second Instance of Defamation**

50. On May 13, 2026, only two days later, O'Leary appeared on *The Tucker Carlson Show*, once again wearing a "Utah National Security" hat, and when invited to speak immediately launched into a speech about how the Chinese are certain to be behind any opposition to the development of data centers in the United States. (*See* https://www.youtube.com/watch?v=xTAJnJUos3g.)

51. He stated that he has "started to dig in the last week looking at all of these strings that are attacking the Utah proposal" and continued his narrative, making the following statements throughout the interview:

> a. I must tell you and this is the first time this has happened to me. I have a pretty big team, as I'm sure you do, on social media. I'm managing a network of 12 million plus followers on different platforms, on all of them. And so about four hours after the vote was unanimously passed on — it was a Monday night, at around 6:05 Utah time, I got a phone call from one of the people that watches our network, looks for abnormalities, and he said, "there's something going on here, something very unusual on Instagram and on Twitter," which is now X, and I said, "what do you mean?" He said, "the spiking of a bunch of IP addresses that we don't know, and it's spewing out a tremendous amount of information." I said, "okay guys, let's get our team—" because I'm very fortunate, I've got a bunch of very good data scientists, investigative data scientists if you want to call them that, probably one of the best teams privately outside of the government in the Department of Defense. My team's pretty good. You can make the assumption they once worked in these agencies. Alright, let me give you some names here, Tucker. Party for Socialism and Liberation, apparently shares offices with the CPP [sic] all over my social media.
>
> b. I wanted to just finish with the list because I don't think, Tucker, you get the enormity of what's going on here. … Well, I want to mention two that are cells inside of Utah, which really stunned me. This I'd never seen before: Alliance for a

> Better Utah, Elevate Strategies, taking the content from the CPP [sic], repurposing it, and jamming it down the throats of the people of Utah on my social media feed.
>
> c. The amount of hype and hysteria … over all of this stuff … Well, I've already pointed out I think it's being generated by our adversaries, but it's also misinformation. Everything that has been said about that site is false.
>
> d. Even the people in Box Elder, the majority of them want me to hold my shovel and start digging. And that's basically the debate we're having … Because they voted for it unanimously before the Chinese guys … Like all this crap that's being spewed out in the last 48-hours.

52. This interview garnered more than 1 million views, and while Knuth was not mentioned by name during this interview, O'Leary's statements reinforced the narrative he had began on *Mornings with Maria* and buttressed his message that those various individuals and entities he had called out by name, including Knuth, were in fact Chinese operatives.

**Third Instance of Defamation**

53. On May 15, 2026, O'Leary gave an interview with Chris Cuomo on *Cuomo Mornings*, in which he continued his false narrative. (*See* https://www.facebook.com/ChrisCuomo/videos/kevin-oleary-aka-mr-wonderful-joins-me-on-cuomo-mornings-to-discuss-the-economic/1002497085558855.)

54. During that interview he stated:

> I hired some forensic digital auditors, and I just got the report back last night. There is something called, in Utah, the Alliance for a Better Utah, run by ... **Taylor Kn-oth [phonetic]** … . So my team went back for the last 24 months and looked at every IRS filing, Form 990s, that would have funded this organization and wow, wow, here's what we found out. Arabella, which is a Chinese CPP [sic] organization, has funded in three different directions, this thing in Utah, so this guy … **Taylor** … **Taylor** … we're going to publish this this weekend, the entire report—good luck to those guys … they are going to have to explain because … it's irrefutable—these are IRS 990 filings. This thing in Utah is funded by the Chinese government. They should change the name from the Alliance for a Better Utah to Alliance for a better China in Utah.

(*Id.* (emphasis added).)

55. He continued "There's so much B.S. about the Utah project spewed by the Chinese." (*Id.*)

56. The interview was then posted on Mr. Cuomo's Facebook account, where it continued to garner thousands of views.

57. Despite his continued failure to properly pronounce Taylor Knuth's name, the references to Taylor "Kn-oth" was a direct reference, and was intended to be a direct reference, to Taylor Knuth.

**Fourth Instance of Defamation**

58. On May 16, and despite the fact that Alliance for a Better Utah had refuted O'Leary's claims on multiple occasions, Fox put O'Leary on the air again, during *Saturday in America*, and specifically asked O'Leary about his data center project in Utah. (*See* https://archive.org/details/FOXNEWSW_20260516_140000_Saturday_in_America/start/2160/end/2220.)

59. During this segment, O'Leary stated the following:

> I started to wonder why, when on the morning of May 4th, I had a huge uplift in complaints on my own social media feeds. And our own people started doing a digital audit and we found this organization in Utah that was really, really, pushing out misinformation into Box Elder county. I don't know these people, but they're called Alliance for a Better Utah, and I thought "Gee, this is really expensive to do what they're doing. Who's funding it!?" So, I lodged an audit, and lo and behold, this money is coming from China … and I'm going to publish it over the weekend. We looked at all the IRS form 990s that through a really clandestine—its amazing, they're basically bringing in millions of dollars into Utah to push out PR trying to stop any advance in power generation or in AI compute or any kind of compute. Who would want that? Only the Chinese. I can't believe it. I couldn't believe it. But they should rename this thing Alliance for a Better China in Utah after you look at how much money is coming out of China, pouring into this organization.

(*Id.*)

60. The Fox host, Kayleigh McEnany, then legitimized his claims without having seen his purported evidence, and pushed him to go further, and in response O'Leary stated:

> This is irrefutable. This is Form 990 from the IRS. Now it's done through a whole bunch of clandestine different entities and I've traced every single one and I'm going to publish it today. And I hope these people, **Taylor Noth [phonetic]** … whoever they are, who run this organization—they've got a lot of explaining to do to their fellow citizens in Utah, because they are not, it doesn't look like to me they're supporting the mandate in Utah at all. They're supporting China.

(*Id.* (emphasis added).)

61. Again, although O'Leary could not properly pronounce Taylor Knuth's name, the references to Taylor "Noth" was a direct reference, and was intended to be a direct reference, to Taylor Knuth.

62. And, once again, O'Leary spun a false tale of Chinese influence and bribery, and named Knuth specifically, without basis, as a Chinese operative who would have "a lot of explaining to do to [his] fellow citizens in Utah." (*Id.*)

63. Meanwhile, Fox promoted it, legitimized it, and publicized the accusations themselves on national television and, upon information and belief, then recirculated it on various of Fox's social media pages.

64. Fox was not publishing a story about defamation.

65. Fox published the defamatory statements themselves as if they were established fact.

**<u>Fifth Instance of Defamation</u>**

66. On May 20, 2026, Fox continued presenting O'Leary and O'Leary continued spouting his narrative about Chinese operatives in Utah, when he appeared on Fox's *The Big*

*Money Show.*
(https://kunzlerlaw.sharepoint.com/:v:/r/sites/Litigation/Documents/Knuth,%20Taylor%20(18043)/In-House%20Complaint%20Links/Big%20Money%20Show%20May%2020%202026.mp4?d=wf2646eec74594766b10eb60d585b97b0&csf=1&web=1&e=PKVenu.)

67. O'Leary continued his narrative that Alliance for a Better Utah, and the individuals behind it—including Knuth—were being paid by and were operatives of the Chinese Communist Party.

68. He then claimed, in ominous and threatening language, that federal law enforcement authorities were investigating his claims and that he had shared his "evidence" with them stating:

> I'm breaking some news here. I got a call yesterday from a Special Agent—I will not tell you from which part of the government—along with four other Special Agents all from different parts, saying "You want to collaborate with us? You have IP addresses that only we know about … So I said to the government, guys, let's form a team. I will give you 90 pages of IP addresses that hit my social media. I know who they are because I hired my own guys, Ph.D. guys that can do this stuff. I have all their addresses, now you have them. … So, let's shine the light of transparency on these people. Here's a chart of … IRS 990 filings just to the Alliance for a Better Utah. What the hell are they taking Chinese money for? All proven, all through these nefarious entities. My guys found this. I gave it to the government. Good luck boys. Enjoy your new friends.

(*Id.*)

69. During the show, O'Leary presented a page with a chart on it that purportedly showed the flow of money from China to Alliance for a Better Utah, and thereby, supposedly to Knuth. (*Id.*)

70. Upon information and belief that sheet was from an "Investigative Report" O'Leary published online. (*See* https://web.archive.org/web/20260522013553/https://abu-990-investigation.pages.dev/) But, that Investigative Report contained no organizational or transactional link between Alliance for a Better Utah and any Chinese entity, and did not actually show any flow of money from China to Utah (and of course did not provide support for, or walk away from, his repeated prior claims that Knuth was running Alliance for a Better Utah).

71. Instead, this piece of paper was a baseless prop, used by O'Leary to give his false claims the patina of legitimacy.

72. O'Leary concluded the segment by doubling down on the veracity of his claims, holding up purported documentation of his evidence and stating, "I can't believe this stuff. I can't believe it. And I have the IP addresses, I've got the links, I've got the content, and now the government has it, and we're going to work together. We're going to shine the light on this thing." (*Id.*)

73. Upon information and belief, Fox, for its part, did nothing to investigate this purported evidence. Fox did not question it, Fox did not qualify it, and did not validate it independently.

74. Not once did Fox question O'Leary or his assertions.

75. Instead, Fox presumed the truth of O'Leary's presentation and in fact stated that it was supported by other reports about Chinese attempts to influence AI development in the States.

76. Throughout the segment, Fox verbally affirmed O'Leary's claims, and spoke as if they were absolutely true.

77. Fox ignored any possibility that the allegations might be false or that the purported evidence might not support O'Leary and Fox's conclusions.

78. But had Fox employed even a modicum of effort to review or investigate the prop O'Leary held, Fox would have or should have known that O'Leary's claims were reckless at best and entirely false at worst.

79. Together, and although they did not name Knuth individually in this instance, Fox and O'Leary reemphasized their earlier narrative and attempted to give it teeth by claiming that federal investigators were now pursuing Alliance for a Better Utah, and therefore Knuth.

**Sixth Instance of Defamation**

80. That same day, O'Leary and Fox presented this information again during a segment of the Fox show *The Bottom Line*. (*See* https://kunzlerlaw.sharepoint.com/:v:/s/Litigation/IQAFke4vS7eTRqjEcUp7W5AaAbpmj6n0LwAfEjXIbXUrVjQ?e=BZGK5C.)

81. Fox host Brian Brenberg specifically introduced the tale asking O'Leary, "What are you going to do about the data center opposition? … I think there might be some that's not home-grown." (*Id.*)

82. O'Leary seized on the pre-arranged softball, stating:

> I'm trying to get the misinformation squashed because there's so much falsehood about it. And we're wondering, it costs a lot of money to pump out that much misinformation—for example, that we are building one the size of Manhattan or two times the size of Manhattan, that's ludicrous … So a lot of people spreading a lot of misinformation, and I was interested as just one guy, where's it coming from? Who's paying for it? And so, I hired some data scientists, some experts to scrape IP addresses. Um, wow. I got some crazy things. … Alliance for a Better Utah, where are they getting the money from? Bad places. This is all IRS filings. This is all the money that's going to these guys from nefarious content that's being investigated right now by Congress. I mean, there's some bad dudes doing this

> stuff. … I have 90 pages of data. … I took my 90 pages of IP addresses from foreign countries and gave it to the government. They're having a hay day with it.

(*Id.*)

83. Once again, O'Leary held up his chart and represented that his claims were backed up by solid evidence, presented to the government, that the government was using to prepare a threatening investigation, and that Knuth should prepare accordingly. (*Id.*)

84. And again, upon information and belief, Fox did nothing to investigate the claims, investigate the evidence, verify the allegations, or otherwise confirm that the "bad dudes" (i.e., Knuth) were actually connected to China *in any way*—if they had, they would have seen that this narrative, and Knuth's role in it, were fabricated, that the chart O'Leary waived in his hand was nothing more than a prop, and that the claims were verifiably false based on O'Leary's own data. (*See id.*; *see also* https://web.archive.org/web/20260522013553/https://abu-990-investigation.pages.dev/.)

85. Instead, Fox presented O'Leary's claims as irrefutable fact, supported them through its rhetoric, and affirmatively published the claims as part of its ongoing narrative.

86. Although the Alliance for a Better Utah continued to refute the claims, including by claiming that it openly publishes the source of its funding, O'Leary and Fox did not change course.

**<u>Seventh Instance of Defamation</u>**

87. On May 24, 2026, O'Leary then took his threats of governmental investigation to Social Media, posting the following on X:

> *The national #DataCenter debate continues this week with the addition of some new but more moderate and analytical voices including those of @TuckerCarlson @joerogan and legendary investor @pmarca Over the weekend The Salt Lake*

> *Party for Socialism and Liberation and The Salt Lake Democratic Socialists of America along with the Alliance For A Better Utah organized a protest. How did they finance that? I asked my digital team and forensic auditors to dig deep into their mandatory IRS form 990 filings and that is where the story got interesting. It's foreign dark money from an organization called Arabella that is funding their operations in Utah. It is my understanding that Arabella is under federal investigation. We are now cooperating with agents of multiple branches of the government and will continue to hand over all our findings over to them. As for the woman in Colorado that made death threats to my immediate family and executive team, as you just learned, law enforcement takes these matters very seriously and you were visited by the FBI. You did a terrible job trying to hide yourself online, my digital guys nailed who you were in 90 seconds. I'm lucky to be working with such a talented team that will continue to shine the light of transparency on those that take money from foreigners and use it to try and block development that would provide new power and compute capacity to build the economy and defend our way of life. What is the lesson here? When in doubt follow the cash, it never lies. Want to see how the dark money comes into Utah and all the other states that are trying to build power? Check this out https://abu-990-investigation.pages.dev Finally to* ***Taylor Knoth***[sic] *... who run[s] Alliance for a better Utah, consider me your new special friend!*

(*See* https://x.com/kevinolearytv/status/2058641637941658062 (emphasis added).)

88. The reference to Taylor "Knoth" was a direct reference, and was intended to be a direct reference, to Taylor Knuth.

89. This threatening language perpetuated the narrative that Knuth was a Chinese operative engaged in criminal acts and dirty with dark money.

90. That post, conveying these direct and unequivocal messages, was then reposted 70 times and obtained nearly 27,000 views, spreading the narrative far beyond O'Leary's ability to recall or control.

**<u>Eighth Instance of Defamation</u>**

91. And, on the same day, Fox and O'Leary again called out Knuth as a Chinese operative working in Utah against O'Leary's data center project. (*See*

https://archive.org/details/FOXNEWSW_20260524_210000_The_Big_Weekend_Show/start/3000/end/3060.)

92. During Fox's *The Big Weekend Show*, Fox host Johnny "Joey" Jones presented some background behind the data center controversy, then introduced O'Leary stating, "I know that your counter to this is that a lot of this criticism is Chinese propaganda." (*Id.*)

93. After some back and forth, O'Leary stated:

> So, I was wondering, where is all this information coming from when it started the evening of May 4, when we got approved. And … something called Alliance for a Better Utah, run by somebody name **Taylor Kn-ath [phonetic]** … . Who's funding them? Arabella ventures. How did I find that out? I put my auditors on top of them and looked at the IRS filings—990s. Foreign money going into Utah? What is the Cuban Institute for Friendship of the People walking around in Box Elder county for? Who are these people? Salt Lake Party for Socialism and Liberation? Salt Lake Democratic Socialists for America? Where is that money coming from? How can they afford to bus these people in? Here are the facts from the IRS. … Open your books, let's talk about it. … The facts from the IRS filings. I am sorry, but I'm a little unhappy. I want to tell the truth. So, let's get it out there and put it on. Because I don't like foreign money telling people what to do in America. You shouldn't either.

(*Id.* (emphasis added).)

94. Fox host Tomi Lahren validated those assertions, stating:

> You know, Kevin, I totally understand that, and I do think that there is a lot of propaganda—anti AI propaganda—that's getting pumped in on TikTok and elsewhere. We're seeing a lot of young folks even at their college graduations, when AI is brought up, them audibly booing. So, it's obvious to me that there are definitely campaigns, foreign funded campaigns, into discouraging AI and the things needed for AI here in the US, which I think is, to your point, also BS.

(*Id.*)

95. O'Leary continued his tirade stating "I'm getting a little ticked off. So, I've had enough. And I've hired a lot of people to go find out who is funding these falsehoods, and it all leads from foreign dark money." (*Id.*)

96. O'Leary then issued a clear threat: "And the people in Utah that are taking this money, I gave this data to the Feds on Friday. … I'm showing it all to everybody, I've had enough of this stuff." (*Id.*)

97. And he concluded by asserting that he had verified evidence supporting his claims:

> If you want the information, I've got it. All of it. IRS irrefutable filings—what are those people doing in Utah? Why do they have a say in what happens in Utah? Let people in Utah vote. I am 100% good with that, and I want to give them the true information. … Enough already. I am just one person saying this is ridiculous. It's got to stop. Let's get the facts in front of the people, and ask who you're marching beside. Who paid for you to be here? Are they from Cuba? Are they from China? Where did this come from? Why are you here if you don't live in Utah?

(*Id.*)

98. The Fox hosts ended the interview with an "Alright, Kevin O'Leary, thank you for joining us" and made no effort to inquire about his claims, ask for evidence, verify the allegations, or push back on his assertions—instead, they allowed him to present his spurious accusations carte blanche.

99. Although Fox published O'Leary's allegations, verbally affirmed them, and invited him to present this "irrefutable" information, Fox never once invited Knuth or any other party to present a counterpoint in the discussion of whether Chinese operatives were behind the opposition to O'Leary's database.

100. Instead, Fox's publication again ignored any possibility that the allegations were anything other than undisputed fact.

101. Upon information and belief, O'Leary then posted the interview to his social media accounts, adding a caption that read "After reviewing IRS filings and conducting audits, I

became convinced that foreign linked money, including interests connected to China, is helping fuel efforts to slow power generation and data center development in the United States."

102. Upon information and belief, these posts received more than 138,000 views.

103. In the segment, although O'Leary could not properly pronounce Taylor Knuth's name, the reference to Taylor "Kn-ath" was a direct reference, and was intended to be a direct reference, to Taylor Knuth.

**Ninth Instance of Defamation**

104. On May 25, 2026, Kevin O'Leary continued his smear campaign on his own.

105. That day, he posted to his public social media accounts stating:

> We uncovered something far bigger than I ever expected. After seeing coordinated false attacks against the Utah data center project, we brought in an advanced data science team to trace where the content was coming from and the results were shocking. What we found led back to organized networks, political activist groups, and funding trails tied to massive international entities. We dug through IRS 990 filings, tracked IP data from around the world, and uncovered what appears to be a coordinated campaign targeting energy and data center projects across multiple regions. I shared 90 pages of evidence with federal law enforcement and raised concerns directly with contacts at the White House. This isn't speculation. The filings, funding records, dates, and connections are documented. There's a coordinated PR war happening around energy infrastructure and data centers, and we're not going to ignore it.

(*See* https://web.archive.org/web/20260525222047/https://twitter.com/kevinolearytv/status/2059036986623819815.)

106. To that post, O'Leary also attached a video of an interview that bore the caption "Exposing Foreign Powers Funding Misinformation About Data Centers."

107. In that interview, O'Leary stated the following:

> The evening of May 4 at 8:30 … I got a call from one of our IT guys, and he said "There's something wrong here. There's a massive influx in DMs going on on two specific platforms, X (formerly Twitter) and Instagram. Not a small increase, tens

> of thousands of percent increase." … So, he had a first look, and he said, "Wow, there's a lot of similar IP addresses here." And so, he did an initial scan, and we realized, wait a second, there's bots operating here, there are nefarious accounts out of the country dumping stuff that's completely false about Utah. So, we didn't wait, the next morning we hired and started working with a very advanced data science team. And what we learned was, to me, shocking. Just stunning. I, I couldn't believe it. I mean I still can't because I am getting the data by the four-hour cycle now. … Most of the, within the IP addresses in Utah were coming from two IP addresses: Alliance for a Better Utah … . So, we found out that Alliance for a Better Utah was actually a tax filer, and we went to the IRS Form 990s, which are public, and we started to drill down into what the filings were. And lo and behold, multiple filings through multiple entities all over the world all going back to something called Arabella [and] Neville Singham, under investigation [by] multiple branches of the government, shares offices with the CPP[sic]. So, then I said I want more. "Can you tell me the exact amounts?" And we got those the next day—we're talking about millions, hundreds of millions of dollars here. … I mean, what is this? And so, I called my contacts at the White House. I raised the flag, and I said, what the hell is going on here? They put me in touch with various law enforcement agents. We had a meeting last week with my entire data set team and multiple law enforcement agencies, and we started sharing data. I gave them 90 pages of IP addresses … from all over the place, all around the world, hitting these locations. See where I'm going with this? I'm not okay with this. … There's a war going on. I guess a PR war, or whatever you want to call it.

(*Id.*)

108. The interviewer then asked: "I mean, is what you are suggesting is that these entities are, sort of, taking funds from the Chinese Communist Party and using those funds to, sort of, run a digital, sort of, blackmail campaign against your project?" (*Id.*)

109. O'Leary responded: "I'm not suggesting it. It's an irrefutable fact. This is IRS 990 filings with the exact dollars and dates, from exactly where it came from. No. No. Not [inferring]. I am saying that is exactly what is happening." (*Id.*)

110. During his speech, O'Leary held up the same chart that purported to link Knuth and Alliance for a Better Utah back to China.

111. Upon information and belief this was from the same "Investigative Report" that contained no reference to China, no reference to Knuth, and no link between the two.

112. And while O'Leary did not name Knuth by name in this instance, his perpetuation of claims against Alliance for a Better Utah reinforced the defamatory statements he made about Knuth and his connection with that organization.

113. Moreover, the continued insinuations of governmental investigation gave additional teeth and threat to O'Leary's comments and their effects on Knuth's life, whether or not he continued to be involved with Alliance for a Better Utah.

**Tenth Instance of Defamation**

114. On May 27, 2026, O'Leary reappeared on national television, this time on NBC News's *Top Story* to make the allegations once more. (*See* https://www.yahoo.com/news/videos/kevin-oleary-addresses-misinformation-utah-014220790.html.)

115. O'Leary started by reciting various areas of purported misinformation about the project and stated that "I'm starting to learn who put [the falsehoods] out" directly alluding to the purported connection between Knuth and Alliance for a Better Utah and China.

116. O'Leary then said:

> There's 66,000 people that benefit from this in Box Elder County. I want to talk to them, and I want them to get the truth. So, I've started to spend a fair amount of money in working with the federal government to find out who is funding this misinformation and we have found out some fascinating stuff. Just since March[sic] 4 and I've given it all back, starting from the White House to all the special agents I am working with with all of the federal agencies. There are some very bad people funding this misinformation. … I'm talking about money coming from nefarious foreigners by the hundreds of millions funding organizations within Utah like the Alliance for a Better Utah. I have the IRS filings that show they took money from Arabella, funded by the Chinese … [I] handed it over to the government. They said

> we've already been investigating this. … Anywhere America tries to build power onto its grid you've got Chinese money brining in protesters and funding protests with misinformation.

(*Id.*)

117. He then recited another list of purported falsehoods about his project and stated "All of this stuff is false, funded by foreign money. And thank goodness … I've proven it with IRS filings." (*Id.*)

118. Despite the host's efforts to redirect the conversation toward other elements of the data center dispute, O'Leary could not stay away from his false narrative of Chinese influence. Indeed, when asked about messaging for his project, O'Leary steered back to the narrative asserting that his social media was being flooded by foreign misinformation.

119. He declared:

> I am doing something that's unique to me, because no one else that develops data centers has 12 million followers. I'm catching, every four hours, the people that are squatting on my social media putting out misinformation. This is one hour old, okay, you're the first to get it—I'm gonna call it breaking news: Someone called Caroline Gleech [phonetic] apparently she fails a Utah senator in 2024—I don't know which party she was with, I don't know her—she is actually putting out falsehoods, with, being funded by something called BEAR and Earthly Education. Where are they from? Australia. Why would Australian money fund her in Utah? I mean, I'm amazed. So, … I have an international team now, we're digging, because most people know that Australia has now become a vector for the Chinese now that they can't use TikTok. So, Caroline, what are you doing squatting on my social media this morning, 26,000 times. What are you doing? Because I'd like to know. So, call me, okay? You're in Utah, you represent Utah people, what are you doing?

(*Id.*)

120. Finally, O'Leary concluded, "Let's ask ourselves: Who is giving us this misinformation? Because they are not very nice people. Okay?" (*Id.*)

121. In stark contrast to Fox, which knowingly or recklessly permitted O'Leary to spout his falsehoods, NBC ended its segment by stating "That group that Kevin mentioned a few minutes ago, Alliance for a Better Utah, they're telling us tonight that they are not proxies for the Chinese government and all of their staff live in Utah." (*Id.*)

122. Upon information and belief, O'Leary then posted portions of this interview to his social media, garnering more than 400,000 views and stated in the caption, "After conducting audits and reviewing IRS filings, we found organizations like Alliance for a Better Utah receiving funding through networks connected to Arabella and foreign linked money tied to Chinese interests. I've turned everything over to federal authorities because people deserve facts, not fear campaigns when deciding the future of their communities."

123. Again, O'Leary's perpetuation of claims against Alliance for a Better Utah reinforced the defamatory statements he made about Knuth and his connection with that organization.

124. Moreover, the continued insinuations of governmental investigation and imminent criminal charges perpetuated the threat of O'Leary's comments and their effects on Knuth's life, whether or not he continued to be involved with Alliance for a Better Utah.

**Eleventh Instance of Defamation**

125. And, on June 3, 2026, O'Leary took his campaign to CNN where he spoke on *The Lead with Jake Tapper* in an interview that aired on television and was later memorialized in a publicly accessible podcast. (*See* https://transcripts.cnn.com/show/cg/date/2026-06-03/segment/01; https://podcasts.apple.com/jp/podcast/scott-kelley-fried-by-cbs-after-clash-with-management/id1034974185?i=1000771072109&l=en-US.)

126. During that interview, O'Leary stated:

> About 8:00 on May 4, after it was announced, all of a sudden on my Instagram and X formerly Twitter feeds, unbelievable explosion of DMs with false information. And I thought to myself, this is really expensive. Who is doing this? … [S]o I hired some forensic auditors and some IP scientists, it led back—because some of this was going into Utah—Alliance for a Better Utah. And I said, OK, … they're tax free, pull their 990s, go do a forensic audit on their IRS filings. Let's find out who's funding this incredibly expensive campaign against our project. … And lo and behold, I couldn't believe it. They all go back to an entity called Arabella, which is funded by a guy named Neville Singham who shares offices with the Chinese party. … And apparently he's under investigation by multiple agencies in the government. So, I took all the data, and I gave it to the government … . They have all the data and I'm just—I'm just taking public filings. It's irrefutable. I know the company's been under scrutiny. … But I don't know how they're going to explain this.

(*Id.*)

127. Upon information and belief, O'Leary also posted this to social media, with a caption stating, "I've been investigating who is funding some of the opposition campaigns and have turned evidence over to federal authorities regarding organizations and funding networks that appear linked to Chinese backed interests."

128. This was a direct reference to his continuing narrative that Knuth was connected to Alliance for a Better Utah and had been acting as a proxy for the Chinese government, and perpetuated O'Leary's assertion that Knuth was a "bad dude" that was soon to be investigated by the federal government.

129. Over more than a month, O'Leary wove a dramatic narrative, calling Knuth out by name and falsely associating him with Alliance for a Better Utah's efforts to oppose his data center project, then accusing Knuth of accepting Chinese money for malicious purposes, acting as a proxy for the Chinese government, and violating numerous laws along the way.

130. Not only this, but the assertions were presented as "irrefutable" fact, supported by pages and pages of proof, that had been submitted to federal agents and was now the subject of communications with the White House and federal investigation.

131. Collectively, O'Leary's messaging constituted an extreme "Defamatory Campaign."

132. What is more, O'Leary took pains to signal to his audience, including his millions of followers, that the statements he was making were factual, and not mere bloviating or spin.

133. He did this by reciting numerous pieces of supportive evidence. He mentioned calls he received from his data team, various abnormalities in data, reports directly linking foreign funding to advocates against his data-center project, specific filed tax forms proving the connection, promises to publish detailed evidence, and conversations with federal agents inquiring into the circumstances he was explaining.

134. Indeed, in claiming that he had spoken with federal agents, Mr. O'Leary claimed that he was "breaking some news here," an obvious sign that he was intending to be taken literally.

135. His subsequent comments indicated that multiple branches of the federal government were investigating these facts, using the "90 pages" of data he had submitted to support his claims.

136. All of these statements were intended to indicate to his audience that these were factual statements, rather than hyperbole. He made this clear in affirming that the evidence against Knuth and others working with him was "irrefutable."

137. In spite of the incredible effort O'Leary invested in disseminating these claims, and the enormous structure of subordinate facts he spun out to buttress their plausibility, none of these statements were true.

138. O'Leary never contacted Knuth to verify his purported suspicions and knew he had no real evidence for the allegations—yet he presented them as verified fact anyways.

139. Alliance for a Better Utah went on record as early as May 16, 2026, clarifying that Knuth was a "former employee." (*See* https://betterutah.org/the-only-foreign-interest-in-this-data-center-is-kevin-from-canada/.)

140. But O'Leary persisted in his campaign for several additional weeks.

141. Meanwhile, Fox actively invited O'Leary onto its station, on various shows, and allowed, even invited him to share this false narrative and publish these accusations.

142. Fox's publication of O'Leary's statement was not a report regarding an individual's purported defamatory statements—instead Fox was publishing the defamatory allegations themselves, as spoken through its guest speaker's mouth and substantiated by its own hosts.

143. During those broadcasts, Fox's hosts regularly made comments that legitimized the claims, and never contradicted them.

144. Even on the rare occasion that they did explain that some pushback to the project could have been locally grown they did not present any party or voice to contradict or speak out against O'Leary's allegations that Knuth had acted as an operative of the Chinese government and had been laundering money in favor of foreign interests.

145. Fox invited, elicited, entertained, legitimized, amplified, and perpetuated O'Leary's claims on its television programs, streaming services, and social media platforms, thus furthering its anti-Chinese narrative and weaponizing O'Leary's claims against his opponents by creating a wide-spread and inescapable narrative.

146. And because Knuth had been individually named as one of the purported perpetrators, that inescapable narrative swept Knuth into its jaws even when Knuth's name was not spoken or identified specifically.

147. Upon information and belief, Fox did nothing to verify the allegations, push back on their legitimacy, or indicate that they had not been proven nor investigated.

148. In fact, on the May 27 broadcast of *Varney & Co*, Fox admitted that "there is no independent verification of this claim," instead assuming the presented allegations to be "irrefutable" fact, as O'Leary had claimed. (*See* https://visualexplorer.gdeltproject.org/tvv?id=FBC_20260527_130000_Varney__Company&play=1779890064.)

149. Fox recklessly allowed these statements to be broadcast broadly across its network over a period of time, on multiple occasions, despite Alliance for a Better Utah's direct rejection of the assertions, and the increasingly apparent lack of legitimate evidence O'Leary was able to present.

150. Indeed, had Fox taken the time to review the prop chart and purported Investigative Report, it could easily have seen that O'Leary's claims of supporting evidence were questionable at best and outright false at worst—indeed, Knuth had publicly announced the separation weeks before O'Leary's first appearance,

(https://www.linkedin.com/feed/update/urn:li:activity:7471216680048869376/), and shortly after O'Leary's campaign began, Alliance for a Better Utah confirmed the separation, (https://betterutah.org/the-only-foreign-interest-in-this-data-center-is-kevin-from-canada/).

151. As a journalistic institution, Fox has an obligation to ensure that claims made through its broadcasts are made with some modicum of factual basis, and in fact, Fox has the capability to do so. Fox did none of that here.

152. Fox certainly did not contact Knuth to inquire about his position on the defamatory allegations levied against him.

153. Fox never presented any alternative viewpoint on whether Chinese interests were driving the opposition to the data center.

154. And in fact, Fox appears to have a history of intentionally avoiding any obligation to "fact-check" the assertions of information presented through its network. (*See* https://www.youtube.com/watch?v=KZtp8u_Fk0s (documenting a Fox producer's statement that she "did not believe that it was [her] responsibility to fact check where or not what someone was going to say on the broadcast was telling the truth" and her subsequent admission that she "was bullied, intimidated, and coerced into saying that just to keep [her] job and stay at the company")).

155. Fox demonstrated inexcusable recklessness in these failures.

*Criminal Nature of Allegations*

156. Not only did the allegations damage Knuth's reputation and subject him to public hatred, contempt, or ridicule—especially in light of the impact such allegations would have on

Knuth's chosen career in progressive organizing and fund raising—but the allegations themselves accused Knuth of criminal conduct.

157. Indeed, 18 U.S. Code § 951—Agents of Foreign Governments provides steep criminal penalties for individuals acting at the direction or control of a foreign government, just as O'Leary accused Knuth of doing here.

158. What is more, O'Leary signaled as much to his audience by repeatedly affirming that law enforcement was investigating the connections. He mentioned conversations with a special agent, referred to multiple branches of government, and noted that investigators were "having a hay day" with the data he had supplied to them. He even alleged that the nefarious activities of his opponents were now being investigated by Congress.

159. The strength of these threats was exacerbated by the current administration's focus on China as its top counterintelligence priority. (*See* https://www.fbi.gov/investigate/counterintelligence/the-china-threat.)

160. These statements were clear signals to O'Leary's audience that the funding mechanisms supposedly employed by Knuth were not only bothersome but criminal.

*Nationwide Publication*

161. Through his persistent efforts, O'Leary ensured that his statement was broadcast across the nation.

162. O'Leary spouted his claims through no less than three national news broadcasters (Fox, NBC, and CNN).

163. Moreover, and upon information and belief, in addition to other mediums, outlets, and publications, O'Leary reposted many of these interviews and restated these claims on his

social media profiles—including X, YouTube, Facebook, Instagram, and TikTok, across which he claims to have more than 12 million followers—causing his narrative to permeate social media, news headlines, and AI search responses in a variety of communities both online and offline.

164. For its part, Fox also ensured that the messages were broadcast across the nation.

165. Fox itself estimates that its news media "reaches nearly 200 million people each month." (*See* https://www.foxcorporation.com/businesses/fox-news/.)

166. Many of the Fox news segments containing the defamatory allegations remain accessible through the internet to this day.

167. Upon information and belief, they have been viewed by millions and millions of individuals across the country.

168. Moreover, O'Leary's claims infiltrated AI responses relating to inquiries about Knuth. To date, one can hardly search Knuth's name in commonly-used AI platforms without coming across the accusations (often without the retractions).

169. Upon information and belief, AI platforms have further caused this narrative to proliferate and have likely had a direct impact on Knuth's employment prospects as these unfiltered and unretracted reports reach potential employers who leverage AI platforms to evaluate job candidates.

170. And, upon information and belief, changes to how AI platforms crawl large portions of the internet will only render the retractions more difficult to find and allow the false narrative to be further perpetuated in AI search results.

*Law Makers Regurgitate O'Leary's Claims*

171. O'Leary and Fox's claims were so well publicized that certain lawmakers in and from the State of Utah also began trumpeting the narrative.

172. Senator Mike Lee, one of Utah's United States senators posted O'Leary's May 25, 2026 interview and stated "If true—and O'Leary seems confident it is—this is incredibly disturbing … And it speaks volumes about the organizations they use to manipulate Americans." (*See* https://x.com/BasedMikeLee/status/2060746771501105510.)

173. Meanwhile, Senator Todd Weiler, a Utah State senator from southern Davis County, posted "You can hate Kevin O'Leary, Stratus[sic], and the data center--but still ask yourself why alliance for a better Utah his being partially funded with Chinese money." He then posted a purported breakdown explaining the flow of funds. (*See* https://x.com/gopTODD/status/2063316200344764420.)

174. But in the end, Todd Weiler had to admit, "Oops. I was duped. Sorry everyone." (https://x.com/gopTODD/status/2071806975521034243.)

175. Indeed, when O'Leary admitted publicly that he had no evidence to support his claims, Weiler was left with little choice.

*Defendants' Admissions of Falsity*

176. Despite his numerous claims of "irrefutable" evidence, and his assertions that he had pages of analysis he had handed over to federal agents, O'Leary never published actual evidence, never showed the work that justified his allegations, and never established any connection between Knuth and China or the Chinese Communist Party, or any statements by law

enforcement or security officials expressing interest in investigating opponents of the data center project.

177. And, not only have Knuth and Alliance for a Better Utah refuted O'Leary's allegations, Caroline Gleich, who was also referenced during O'Leary's NBC interview, went on record bluntly denying O'Leary's claims that she was putting out falsehoods and was funded by Australian (as proxy for the Chinese) money. (*See* https://carolinegleich.substack.com/p/kevin-oleary-went-on-national-tv; https://www.youtube.com/watch?v=na1ueKg-3yo.)

178. Moreover, even cursory searches reveal that BEAR—referenced in the same interview—is not an Australian entity, but is a grassroots effort led by local Utahns. (*See* https://www.stopstratos.org/; https://www.fox13now.com/news/fox-13-investigates/heres-how-much-water-kevin-olearys-partner-says-data-center-will-use-and-what-it-could-mean-for-utah.)

179. Such brazen and baseless accusations illustrated the recklessness of O'Leary's accusations at the time they were made and eventually O'Leary had to come to terms with and admit this reality.

180. On June 10, 2026, days after receiving a June 5, 2026, demand from Alliance for a Better Utah, O'Leary shifted his tone. When referring to the purported misinformation campaign around his data center project during a Fox interview, O'Leary stopped naming specific entities or individuals. Instead, he stated "I don't know who's doing this" "But this is not normal, and I'm going to find out." (*See* https://www.fox13now.com/news/fox-13-investigates/in-new-interview-oleary-talks-that-poll-and-paying-for-box-elder-county-data-center.)

181. And, on June 25, 2026, O'Leary publicly admitted the recklessness and falsity of his allegations. (*See* https://x.com/kevinolearytv/status/2070227278169059350).

182. In full he stated:

> Recently I appeared on various news programs and would like to clarify that I have no evidence that Alliance for a Better Utah, Elevate Strategies, Gabrielle Finlayson, Taylor Knuth or Josh Kanter are funded by China or the Chinese Communist Party.

(*Id.*)

183. On his final attempt, he finally conveyed Taylor Knuth's name accurately, confirming that he had been talking about Knuth all along, and simultaneously disclaimed—in direct contradiction to his numerous reassurances—any basis for his allegations.

184. If that weren't enough, O'Leary went on several times to apologize for the messaging around the project, admitted that he "really screwed … up" communication of the data center plans. (*See* https://www.fox13now.com/news/local-news/box-elder-county/oleary-agrees-to-dramatically-reduce-stratos-project-data-center-footprint; https://finance.yahoo.com/technology/articles/kevin-oleary-said-messed-messaging-052244524.html; https://www.ksl.com/article/news/utah/kevin-oleary-agrees-to-cut-box-elder-county-data-center-project-area-in-half/51592076.)

185. Fox also pulled back its messaging on the issue.

186. Indeed, Fox conducted O'Leary's June 10, 2026, interview and prompted him to walk back his allegations by asking whether O'Leary thought the Chinese government was influencing public opinion. In response to that invitation, O'Leary expressly stated, as recited earlier, "I don't know who's doing this." (*See* https://www.fox13now.com/news/fox-13-

investigates/in-new-interview-oleary-talks-that-poll-and-paying-for-box-elder-county-data-center.)

187. Fox also admitted the falsity of its allegations and its publications, issued a retraction and apologized no less than four times. (*See* https://www.huffpost.com/entry/fox-news-apologies-kevin-oleary_n_6a421fc1e4b0f259890da9ad *and* https://www.youtube.com/watch?v=t0DeKm0JYo0 (each summarizing and compiling the Fox retractions and apologies).)

188. On June 26, 2026, Maria Bartiromo, from *Mornings with Maria*, presented a retraction stating:

> Meanwhile there's this, Kevin O'Leary appeared as a guest on this program back on May 11 and discussed the ongoing controversy surrounding his planned data center project in Utah. Now, he made certain claims relating to the opponents of that project. Mr. O'Leary has now corrected the record and explained that he has no evidence that the Alliance for a Better Utah, Elevate Strategies, Josh Kanter, Taylor Knuth, or Gabrielle Finlayson are funded by China or the Chinese Communist Party. Fox News Media is likewise aware of no evidence that they are funded by or acting at the direction of or in coordination with Chinese interests in opposing Kevin O'Leary's project. Fox News Media apologizes for the error.

(https://www.mediamatters.org/artificial-intelligence-and-data-centers/fox-business-anchor-maria-bartiromo-apologizes-guest-kevin.)

189. On June 27, 2026, Kayleigh McEnany, from *Saturday In America*, presented a retraction stating:

> So Kevin O'Leary appeared as a guest on this show on May 16 and discussed the ongoing controversy surrounding his planned data center project in Utah. He made certain claims relating to opponents of his project. Mr. O'Leary has now corrected the record and explained that he has no evidence that the Alliance for a Better Utah, Josh Kanter or Taylor Kunth[phonetic] are funded by China or the Chinese Communist Party. Fox News Media is likewise aware of no evidence that they are funded by, or acting in the direction of, or in coordination with Chinese interests in opposing Mr. O'Leary's project. Fox News Media apologizes for the error.

(*See* https://www.youtube.com/watch?v=81hDYKbzGkQ.)

190. Later that same day, Johnny "Joey" Jones, from *The Big Weekend Show*, presented a retraction stating:

> Before we go, Kevin O'Leary appeared as a guest on this show on May 24 and discussed the ongoing controversy surrounding his planned data center project in Utah. He made certain claims relating to the opponents of his project. Mr. O'Leary has now corrected the record and explained that he has—quote—no evidence that the Alliance for a Better Utah, Josh Kanter or Taylor Knuth are funded by China or the Chinese Communist Party. Fox News Media is likewise aware of no evidence that they are funded by, or acting in the direction of, or in coordination with Chinese interests in opposing Mr. O'Leary's project. Fox News Media also apologizes for the error.

(*See* https://www.youtube.com/watch?v=4WroaL63Ug8.)

191. On July 24, 2026, Brian Brenberg, from *The Bottom Line*, presented a retraction stating:

> *Kevin O'Leary appeared as a guest on this show on May 20 and discussed the ongoing controversy surrounding his planned data center project in Utah. He made certain claims relating to opponents of this project. Mr. O'Leary has now corrected the record and explained that he has no evidence that the Alliance for a Better Utah is funded by China or the Chinese Communist Party. Fox News Media is likewise aware of no evidence that it is funded by or acting at the direction of, or in coordination with, Chinese interests in opposing Mr. O'Leary's project. Fox News Media also apologizes for the error.*

(*See* https://www.foxbusiness.com/video/6396219825112.)

192. And, on July 28, 2026, Taylor Rigs, from *The Big Money Show*, presented a retraction stating:

> *We want to make a note here. Kevin O'Leary appeared as a guest on this show on May 20 and discussed the ongoing controversy surrounding his planned data center project in Utah. He made certain claims relating to opponents of his project. Mr. O'Leary has now corrected the record and explained that he has, quote, no evidence that the Alliance for a Better Utah is funded by China or the Chinese Communist Party. Fox News Media is likewise aware of no evidence that it is*

> *funded by or acting at the direction of, or in coordination with, Chinese interests in opposing Mr. O'Leary's project. Fox News Media apologizes for that error.*

(*See* https://www.youtube.com/watch?v=X3E27rJlDf4.)

193. Each of these retractions admitted the falsity of the publications as well as the reckless disregard for truth when they were published.

194. However, upon information and belief many of the original segments in which the false allegations were aired are still accessible with no indication that the allegations have been corrected or retracted.

195. Upon information and belief, to this day, the allegations are more prevalent than the apologies.

196. Indeed, upon information and belief, O'Leary's May 25 post on X garnered over 2 million views before it was deleted while his retraction post, still up to this day, has garnered less than 573,000.

197. At any rate, the retractions were untimely and did essentially nothing to remedy the harms Knuth incurred.

198. The damage had already been done. And none of the retraction statements went nearly far enough, or reached the number of viewers, readers, or commenters that originally received the defamatory statements.

*Knuth's Damages*

199. Although Knuth had been associated with Alliance for a Better Utah before this controversy began, that association ended and was publicly announced on April 2, 2026—nearly a month before the project gained public attention and more than a month before O'Leary began his defamatory campaign.

200. Knuth was a private individual who had no connection with the parties actually in the debate.

201. Nevertheless, Kevin O'Leary identified him by name.

202. Immediately, friends and acquaintances began to identify the references to Knuth and began to reach out to him.

203. Soon even distant and estranged relations informed him that they had heard about the allegations.

204. Eventually Knuth was forced to speak out against the allegations:

> It's not everyday [sic] that a foreign billionaire calls me out by name, but I am happy to announce that on attempt number seven, O'Leary finally spelled my name correctly. 😊
>
> I am still looking for work, by the way, as the CCP does NOT pay my bills. 😂
>
> DM me if you know of something.

(https://www.linkedin.com/feed/update/urn:li:activity:7476035901882826752/.)

205. Despite the chipper tone of his defense, the underlying reality is that the allegations had seriously harmed Knuth, and he knew it.

206. And Knuth's post did not ameliorate any harm.

207. Knuth has gone without employment income since April 2, but his active job search had gone well, with multiple interviews, outreaches, and communications with various employers and the groundwork he laid to build his own business appeared promising at the time.

208. Shortly after the Defamatory Campaign began, he found his job leads drying up and business prospects withering.

209. Knuth soon found his points of contact and network evaporating as individuals asked him not to contact them and as others stopped responding to his job inquiries.

210. Knuth soon realized that not only was employment going to take longer than anticipated, costing him hundreds of thousands of dollars in expected income, but that his career trajectory had been entirely derailed.

211. Knuth's Ph.D. advisor served on the board of Alliance for a Better Utah.

212. Following the onset of O'Leary's Defamatory Campaign, Knuth made multiple efforts to communicate with the entire board—which included his advisor—to address the false allegations. The board chair ignored those efforts.

213. Having had no contact with his advisor for more than a month, Knuth realized his relationship with that advisor had become damaged beyond repair.

214. On May 20, Knuth left his doctoral program as a result of the defamation's impact on his ability to continue with the program and satisfy its requirements.

215. Although Knuth has only three classes remaining, plus a dissertation , this coursework cannot practically be completed elsewhere because Knuth's advisor was uniquely qualified, both academically and intellectually, to advise Knuth on his field of study.

216. In addition, the years of work Knuth had put toward his career were stolen in a matter of days through O'Leary's news appearances.

217. Utah political action and nonprofit work takes place within a small community. The allegations levied against Mr. Knuth spread widely within that community.

218. As a result, Knuth realized that his losses were not limited to his immediate income, but had spread into the income he would have expected to obtain during his next employment.

219. Indeed, Knuth now understands that his next position will almost certainly be a step down from the kinds of jobs for which he was now qualified.

220. Finally, Knuth saw any possibility of an Ogden City 2027 mayoral run, which he had strongly been considering, evaporate overnight.

221. O'Leary's and Fox's defamation damaged Knuth's reputation, name recognition, donor trust, and the likelihood of endorsement from the Utah political community—the exact fuel that municipal candidacy runs on.

222. Instead, any opponent now has a plethora of unsavory accusations at their fingertips, including the phrases "foreign agent," "Chinese proxy," and "dark money."

223. These unsavory accusations subject Knuth to public hatred, contempt, and ridicule.

224. And the retractions and apology did nothing, and cannot do anything, to ameliorate this harm.

225. To this day, despite continuing efforts to mitigate this harm, Knuth has been unable to overcome the allegations, or their impact on his network, and relationships.

226. Knuth was also impacted psychologically, emotionally, and physically.

227. Since the Defamatory Campaign began, Knuth has experienced sleeplessness, severe mental anguish, severe anxiety, extreme and frequent fear of threat from individuals persuaded by Defendants' allegations, harassment from social spaces on the internet and within

his community, paranoia, lack of appetite, depression, severe sadness, and substantial detriment to his overall well-being.

228. O'Leary's threats that a federal criminal investigation was imminent and insinuations that the FBI could come knocking on the door any day added to this severe distress and exacerbated that distress that had already existed.

229. Knuth's emotional, psychological, and physical reactions to the defamation passed beyond extreme discomfort and, in fact, became clinical in nature.

230. Knuth continues to work toward regaining the mental health and lack of resulting physical symptoms he experienced before the defamation began, but progress is slow, halting, and sometimes non-existent.

231. On top of these various harms, and in conjunction with those economic harms already described, Knuth has already suffered special financial harms in the tens of thousands of dollars. Those special damages increase each day.

## FIRST CAUSE OF ACTION
**Defamation and Defamation Per Se**
(*Against Both Defendants*)

232. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

233. As described more fully *supra*, Defendants published the Defamatory Campaign broadly through both television media, internet news media, and social media—including, but not limited to, media such as *Mornings with Maria*, *Saturday in America*, *The Big Weekend Show*, *The Big Money Show*, X (formerly known as Twitter), YouTube, Instagram, Facebook, and TikTok.

234. Having been identified Knuth by name, the Defamatory Campaign was about Knuth and continuously asserted that he was a vile and allegedly criminal individual accepting foreign money for gain and acting as a proxy for and operative of the Chinese government.

235. It is unequivocally false that Knuth is an agent of the Chinese government or any party thereof, that he has received funding from any such entity, or that he had any involvement in the data-center controversy as a result of inducements of foreign governments. All of the statements set forth above which suggest the contrary are defamatory statements, which make up the statements subject to this cause of action.

236. The Defamatory Campaign was presented not as a statement of opinion, but as "irrefutable" fact but, was, as a matter of *actual* fact, false.

237. The Defamatory Campaign is not subject to any privilege—especially as it relates to Knuth, who at all relevant times was a private individual.

238. Defendants knew or should have known the Defamatory Campaign was false and that it was unsupported by any real evidence.

239. Alternatively, Defendants publicized the Defamatory Campaign with reckless disregard for its truthfulness and without care for the injuries it caused as set forth above, as any reasonable inquiry into the subject matter would have readily and immediately revealed the falsity of the accusations.

240. In fact, Defendants have admitted the falsity of the allegations and that they have, and never had, any evidence supporting the allegations.

241. Defendants intended the Defamatory Campaign to convey defamatory meanings to their audience and thus to cause harm to Knuth, and intended the same with respect similarly false implications that can be derived from the Defamatory Campaign.

242. The False Statements call into question Knuth's honesty, integrity, virtue, and/or reputation, and thereby exposed Knuth to public hatred, contempt, or ridicule in the eyes of at least a substantial and respectable portion of its audience.

243. The Defamatory Campaign constitutes defamation *per se* because the Defamatory Campaign accuses Knuth of involvement in or responsibility for money laundering, treason, bribery, and a litany of other federal crimes, including violation of 18 U.S. Code § 951—Agents of Foreign Governments, which prohibits individuals from acting at the instruction of foreign governments, just as O'Leary has accused Knuth of here.

244. The Defamatory Campaign also accuses Knuth of conduct which is incongruous with the exercise of his lawful profession, business, and trade, as well as his political involvement.

245. Indeed, as a progressive organizer, who employs substantial time participating in fundraising efforts, accusations that Knuth was laundering money for, and acting at the behest of, a foreign government for personal monetary gain are extremely harmful and render effective performance in his career and fundraising efforts nearly impossible.

246. The serial and ongoing publication of the Defamatory Campaign is causing, and will continue to cause, injuries to Knuth.

247. That necessarily includes reputational harm to Knuth, including, without limitation, lost employment opportunities, lost business opportunities, loss of reputation, physical and emotional damage, and other damages as more fully described *supra*.

248. As a result, Knuth has suffered actual damages in an amount to be proven at trial, but in no event less than $300,000.00.

249. Defendants' acts and malicious intent establish willful or reckless indifference to Knuth's rights and are so egregious as to warrant punitive damages in support of this cause of action.

## SECOND CAUSE OF ACTION
**False Light Invasion of Privacy**
(*Against Both Defendants*)

250. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

251. As described more fully *supra*, Defendants published the Defamatory Campaign broadly through both television media, internet news media, and social media—including, but not limited to, media such as *Mornings with Maria*, *Saturday in America*, *The Big Weekend Show*, *The Big Money Show*, X (formerly known as Twitter), YouTube, Instagram, Facebook, and TikTok.

252. Having identified Knuth by name, the Defamatory Campaign was about Knuth and continuously asserted that he was a vile individual accepting foreign money for gain and acting as a proxy for and operative of the Chinese government.

253. It is unequivocally false that Knuth is an agent of the Chinese government or any party thereof, that he has received funding from any such entity, or that he had any involvement

in the data-center controversy as a result of inducements of foreign governments. All of the statements set forth above which suggest the contrary are false statements, which make up the statements subject to this cause of action.

254. Defendants publicized the Defamatory Campaign nationally, presenting it for consumption by a collective audience of more than 200,000,000 individuals across the United States of America.

255. The Defamatory Campaign was presented not as a statement of opinion, but as "irrefutable" fact but, was, as a matter of *actual* fact, false and therefor placed Knuth before the public in a false light.

256. Having accused Knuth of criminal behavior, accepting bribery to advocate on behalf of a foreign government, of being a proxy or operative for the Chinese government or Chinese Communist party, and misusing nonprofit funds, the false light in which Knuth was placed would be highly offensive to a reasonable person.

257. Defendants knew or should have known the Defamatory Campaign was false and that it was unsupported by any real evidence.

258. Alternatively, Defendants publicized the Defamatory Campaign with reckless disregard for its truthfulness and without care for the injuries it caused as set forth above, as any reasonable inquiry into the subject matter would have readily and immediately revealed the falsity of the accusations.

259. In fact, Defendants have admitted the falsity of the allegations and that they have, and never had, any evidence supporting the allegations.

260. The False Statements call into question Knuth's honesty, integrity, virtue, and/or reputation, and thereby exposed Knuth to public hatred, contempt, or ridicule in the eyes of at least a substantial and respectable portion of its audience.

261. The false light in which Knuth was placed as a result of the Defamatory Campaign is causing, and will continue to cause, injuries to Knuth.

262. That necessarily includes reputational harm to Knuth, including, without limitation, lost employment opportunities, lost business opportunities, loss of reputation, physical and emotional damage, and other damages as more fully described *supra*.

263. As a result, Knuth has suffered actual damages in an amount to be proven at trial, but in no event less than $300,000.00.

264. Defendants' acts and malicious intent establish willful or reckless indifference to Knuth's rights and are so egregious as to warrant punitive damages in support of this cause of action.

## THIRD CAUSE OF ACTION
**Permanent Injunction**
(*Against Both Defendants*)

265. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

266. Defendants' actions have caused, and are substantially likely to continue to cause, irreparable harm to Knuth.

267. Defendants' actions are ongoing and are substantially likely to continue—indeed even since the stated retractions numerous publications of the defamatory statements are still live on various websites and social media platforms over which Defendants have control.

268. Plaintiff's claims are meritorious, and Plaintiff should prevail on his above causes of action.

269. The balance of harms between the parties strongly favors entry of an injunction against Defendants.

270. Public policy strongly favors entry of an injunction so as to prevent further falsehoods and additional irreparable injuries to Plaintiff and to mitigate the ongoing harm by requiring removal of the false statements.

271. Accordingly, Plaintiff is entitled to a permanent injunction restraining Defendants from making disparaging statements regarding Plaintiff in any medium or forum.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury of any issue so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

1. That judgment be entered in favor of Plaintiff;

2. That Plaintiff be awarded a permanent injunction against Defendants, restraining them from further publishing the Defamatory Campaign or any similar statements and causing them to remove or appropriately edit all posts, clips, stories, interviews and other publications that contain the false statements, including all videos referenced herein that are still hosted on websites or profiles controlled by any Defendant.

3. That Plaintiff be awarded compensatory damages for costs and damages incurred as a result of the above-described actions in an amount to be determined at trial, but not less than the threshold amount for a Tier 3 case;

4. That Plaintiff be awarded punitive damages, as allowed by law, for Defendants' intentionally tortious conduct and reckless indifference for Plaintiff's rights as may be determined at trial;

5. That Plaintiff be awarded its costs and fees associated with bringing this case;

6. That Plaintiff be awarded post-judgment interest at the highest amount permitted by law; and

7. That the Court grant such other relief as it may deem just and proper.

DATED: October 14, 2026.

Respectfully submitted,

**MASSEY BEAN & LEWIS**

*_/s/ Ryan B. Bell_*
Ryan B. Bell
Taylor J. Smith

*Attorneys for Plaintiff Taylor Knuth*